IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 2, 2021

# IN RE CHARLES B. ET AL.[1]

**Appeal from the Chancery Court for Henderson County**
**No. 27443     James F. Butler, Judge**

_____

## No. W2020-01718-COA-R3-PT

_____

This appeal concerns the termination of a mother's parental rights. The trial court found that DCS established several grounds for terminating the mother's parental rights and that termination of her rights was in the children's best interest for many reasons. The mother does not challenge any of the grounds on appeal but contends that the trial court incorrectly concluded it was in the best interests of the minor children to terminate her parental rights because she was in the process of completing a rehabilitation program. Following a thorough review of the record, we have determined that several grounds for termination were established by clear and convincing evidence, and termination of the mother's parental rights was clearly and convincingly in the children's best interest. Therefore, we affirm the termination of the mother's parental rights.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which JOHN W. MCCLARTY and ARNOLD B. GOLDIN, JJ., joined.

Samuel W. Hinson, Lexington, Tennessee, for the appellant, Scarlet B.

Herbert H. Slattery III, Attorney General and Mary Kristen Kyle-Castelli, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

William M. Thorne, guardian ad litem, Lawrenceburg, Tennessee, for the appellee, Charles B. and Riley B.

---

[1] This court has a policy of protecting the identity of children by initializing the last names of the parties.

# OPINION

## FACTS AND PROCEDURAL HISTORY

Charles B. and Riley B. (collectively, "the Children") were born in July 2012 and October 2013, respectively, to Scarlett B. ("Mother") and David B. ("Father").[2] On April 3, 2018, the Department of Children's Services ("DCS") received allegations of drug exposure, truancy issues, and environmental concerns. The Children were removed from their home on April 6, 2018.[3]

After the Children were removed, Mother tested positive for methamphetamine, amphetamines, and MDMA. Then, on April 16, 2018, Riley, who was only four years old, tested positive for methamphetamine. Resultantly, the court gave temporary custody of the Children to DCS, and the Children entered foster care—where they have remained since April 6, 2018. The Children have resided in their current foster home since October 19, 2018.

After taking the Children into custody, DCS filed a Petition with the juvenile court for a determination of dependency and neglect, and the juvenile court adjudicated the Children dependent and neglected on September 25, 2018. Riley was also found to be a victim of severe child abuse as defined in Tennessee Code Annotated section 37-1-102(b)(27)(C) after he tested positive for methamphetamine. The juvenile court also entered a no contact order, which prevented Mother from having contact with the Children or witnesses affiliated with the case.

Mother was arrested on aggravated child abuse charges and incarcerated on May 23, 2018.[4] Mother pled guilty to aggravated perjury and giving false reports and was sentenced to four years of incarceration for each offense. Mother also pled guilty to aggravated child abuse, neglect, or endangerment of a child age under eight years of age, for which she received a sentence of twelve years. Mother was given a split confinement sentence with the option to serve a portion of the sentence on probation and a requirement that she complete a long-term inpatient treatment. Mother elected to enroll in Transitions on July 22, 2019, a yearlong program she did not expect to complete until August 21,

---

[2] Father's rights were also terminated. Father did not appeal.

[3] The Department had previously investigated numerous reports on this family—over nine times since May 2014.

[4] At this time, Mother was on federal probation for the theft of over $10,000 of government property.

2020.[5] The yearlong program is comprised of two portions: a nine-month program which required Mother to remain in the main house, and a three-month aftercare program during which Mother moved to a three-bedroom house.

At the time of trial, Mother had entered the aftercare portion of Transitions but had not yet graduated. Mother testified that following her anticipated graduation from Transitions in September 2020, her plan was to stay in the aftercare house to save money; however, Mother acknowledged that the Children would only be permitted to see her up to two days a week as long as she remained in Transitions' housing.

## I.     PERMANENCY PLANS

Amber Kirby, a DCS social worker, developed four separate permanency plans. Each plan required Mother to comply with the following non-exhaustive list: submit and pass random drug screens; attend and complete parenting classes; submit to a psychological parenting assessment and comply with all recommendations; obtain safe and stable housing; visit with the Children; have stable employment or adequate legal income to support the Children; comply with probation/parole requirements; and not incur any additional criminal charges. Between the no contact order and her incarceration, Mother did not attend any of the family planning meetings in person, but she was aware of and in agreement with each plan.

Ms. Kirby developed the first permanency plan on May 4, 2018, with the goal of returning the Children to Mother. Mother was required to: (1) complete a psychological parenting assessment, including a mental health, parenting, and alcohol and drug assessment scheduled on May 10, 2018, with Dr. Will Beyer and follow all recommendations; (2) sign a release with Quinco Mental Health Center; (3) call or attend parenting classes at Carl Perkins Center or contact DCS to arrange in-home parenting services; (4) submit and pass random drug screens; (5) provide necessary documents for Riley to enroll in Head Start or pre-kindergarten; (6) maintain safe and appropriate housing and allow DCS to conduct a home study with background checks for any individual residing in the home; (7) attend therapeutic supervised visitation with the Children at least twice per month if court orders; (8) follow rules of probation and/or parole; (9) refrain from incurring new charges; (10) provide verification of adequate income.

In July of 2018, after Mother's incarceration, Ms. Kirby developed a second plan in which Mother's responsibilities remained largely the same. The goal of the second plan was to unite the Children with a relative. DCS was not successful in uniting the Children with a family member, and the Children were placed in their current foster home in October 2018.

---

[5] The record is unclear as to the exact date that Mother entered Transitions, but it was between July and September 2019.

The third permanency plan was created in January 2019. While some responsibilities remained the same, the third plan directed Mother to certain responsibilities upon her release, including: (1) to complete training for handling a special needs child; (2) to restart services with Quinco Mental Health Center and sign release of information; (3) to maintain safe and appropriate housing and provide receipts of timely rent/mortgage and utility payments to DCS; (4) to apply for at least two jobs per week and provide verification of adequate income. It also required Mother to provide a certificate indicating she completed parenting classes during her incarceration and resolve her pending criminal charges. Like the second plan, the goal of the third plan was for the Children to exit DCS custody with a relative.

The fourth permanency plan, which was entered in August 2019 after the Children had been in DCS custody for over fifteen months, changed the goal to adoption, but otherwise largely mirrored the requirements of the third permanency plan.

## II.    TERMINATION PROCEEDINGS

On October 18, 2019, DCS filed a petition to terminate Mother's parental rights. At the final hearing, the trial court heard testimony from Amber Kirby, Mother, and the Children's foster father, Clinton W. The court also admitted into evidence and considered several documents, including the juvenile court file, Mother's criminal records, and Mother's certificates of completion. At the conclusion of trial, the court announced it would be granting the petition to terminate Mother's parental rights.

In its written order filed on December 3, 2020, the trial court found that DCS established six grounds for termination: (1) severe child abuse; (2) substantial noncompliance with the permanency plans; (3) persistence of conditions; (4) abandonment by failure to establish suitable home; (5) abandonment by wanton disregard; and (6) sentence of more than ten years when the Children were under eight years old. The court also found that termination of Mother's rights was in the best interest of the Children for many reasons, including: Mother's failure to provide a safe home; Mother's failure to maintain regular visitation; Mother's failure to pay child support; and the negative effect that a change in the Children's caretakers would likely have on the Children's emotional, psychological and/or medical conditions.

This appeal followed.

## ISSUES

Mother raises only one issue on appeal: whether the trial court erred in finding that it was in the best interest of the Children to terminate Mother's parental rights while she was in the process of successfully completing rehabilitation. Although Mother does not challenge any of the grounds supporting the termination of her parental rights, we have an

- 4 -

affirmative duty to review the trial court's findings as to each ground the trial court found to have been proved. *See In re Carrington H.*, 483 S.W.3d 507, 525 (Tenn. 2016). Accordingly, we will also consider whether each ground the trial court found to have been proved was clearly and convincingly established. *See In re Navada N.*, 498 S.W.3d 579, 590 (Tenn. Ct. App. 2016).

### STANDARD OF REVIEW

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002) (citations omitted). "[T]his right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).

"To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *In re Carrington H.*, 483 S.W.3d at 522 (citations omitted).

In an appeal, "this court is required 'to review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests.'" *In re Connor B.*, 603 S.W.3d 773, 779 (Tenn. Ct. App. 2020) (quoting *In re Carrington H.*, 483 S.W.3d at 525). In doing so, we must determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Stated another way, we must make our own "determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citation omitted).

The trial court's findings of fact are reviewed de novo upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d at 523–24; *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed de novo with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). A trial court's determinations regarding witness credibility are entitled to great weight on appeal and will not be disturbed absent

clear and convincing evidence to the contrary. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

## ANALYSIS

### I. GROUNDS FOR TERMINATION

The trial court found that DCS established six grounds for terminating Mother's parental rights: (1) severe child abuse; (2) substantial noncompliance with the permanency plans; (3) persistence of conditions; (4) abandonment by failure to establish a suitable home; (5) abandonment by wanton disregard; and (6) sentence of more than ten years. We will discuss each ground in turn.

### A. Severe Child Abuse

A trial court may terminate a parent's rights if the parent "has been found to have committed severe child abuse . . . under any prior order of a court or is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against any child." Tenn. Code Ann. § 36-1-113(g)(4). "Severe child abuse," is defined, in relevant part, as:

> (E) knowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child; or
>
> (F) Knowingly allowing a child to be within a structure where any of the following controlled substances are present and accessible to the child. . . (iii) Methamphetamine . . .

Tenn. Code Ann. § 37-1-102(b)(27).

> In its final order, the trial court held:
>
> Based on the testimony and the exhibits, the Court concludes on the basis of clear and convincing evidence that the child, Riley, is a victim of severe abuse. By Order entered on June 27, 2018, the Juvenile Court of Henderson County, Tennessee found the above-named child to be a victim of severe child abuse as defined by T.C.A. [sic] 37-1-102(27), perpetrated by both parents. This Order was not appealed and thus has become a final Order.

Although Mother appealed the juvenile court's finding of severe child abuse to the circuit court, the appeal was dismissed following Mother's guilty plea. *See In re Trinity H.,* No. M2020-00440-COA-R3-PT, 2020 WL 5110312, at *10 (Tenn. Ct. App. Aug. 28, 2020).

The juvenile court's order finding severe child abuse is subject to res judicata. Because there was a finding of severe child abuse, the trial court properly found severe child abuse as a ground for termination. *See In re Heaven L.F.*, 311 S.W.3d 435, 439-40 (Tenn. Ct. App. 2010) (holding that the res judicata doctrine applies "to prevent a parent from re-litigating whether [] he committed severe child abuse in a later termination of parental rights proceeding when such a finding has been made in a previous dependency and neglect action") (citing *State v. Tate*, No. 01-A-01-9409-CV-00444, 1995 WL 138858, at *5 (Tenn. Ct. App. Mar. 31, 1995)).

Finally, we note that, although only one of the Children was found to be the victim of severe child abuse, the statutory ground allows termination when a parent commits severe child abuse "against *any* child." Tenn. Code Ann. § 36-1-113(4) (emphasis added); *see In re Trinity H.*, 2020 WL 5110312, at *3 (affirming ground based on order adjudicating child's siblings as victims of severe child abuse). Thus, clear and convincing evidence supports the trial court's termination of Mother's parental rights to both Children on the ground of severe child abuse.

### B. Substantial Noncompliance with Permanency Plan

Tennessee Code Annotated section 36-1-113(g)(2) provides that a parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan."

Noncompliance with the permanency plan may be grounds for termination only "if the court finds the parent was informed of [the plan's] contents, and that the requirements . . . [were] reasonable and [were] related to remedying the conditions that necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C); *see also In re Valentine*, 79 S.W.3d at 547. "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. Whether a parent's noncompliance is substantial depends on "the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citations omitted).

As mentioned above, four permanency plans were created for Mother on the following dates: May 4, 2018; July 23, 2018; January 23, 2019; and August 9, 2019. Mother was informed of each of the plan's contents and agreed to comply with them.

While the goal of the permanency plans evolved, the requirements remained largely the same with each plan. Mother was required to: submit and pass random drug screens; attend and complete parenting classes; submit to a psychological parenting assessment and comply with all recommendations; obtain safe and stable housing and transportation; visit with the Children; have stable employment or adequate legal income to support the Children; comply with probation/parole requirements; and not incur any additional criminal charges.

While the first permanency plan was in place, Mother completed the psychological parenting assessment and attended supervised visitation with the Children as required by the plan.[6] Mother's visits ceased when she was incarcerated in May 2018 and the no contact order was invoked. Mother also submitted to drug screens before her incarceration, but she did not pass them.

Regarding Mother's noncompliance with the parenting plans, Ms. Kirby acknowledged receiving clean drug screens from Transitions *after* DCS filed the petition, but noted her concern that Mother has yet to pass a drug screen outside of the rehabilitation facility. Ms. Kirby testified that Mother could have participated in parenting classes while she was incarcerated because the jail offered parenting classes; however, Ms. Kirby testified that she never received certificates of completion for parenting classes that Mother took while incarcerated. Ms. Kirby did acknowledge receipt of some certificates of completion for parenting classes from Mother's stay at Transitions, but explained that she did not receive these until *after* the petition to terminate had been filed.[7] Ms. Kirby explained that Mother had not established suitable housing, but conceded the difficulty of doing so in Mother's position.

The court found by clear and convincing evidence that Mother knew that failing to substantially comply with the requirements of the permanency plans was a ground for termination. The court acknowledged Mother's compliance with some aspects of the parenting plans like: engaging in supervised visits prior to her incarceration; having psychological, mental, and parenting assessments; and, for a period, providing drug screens. It also noted the difficulties presented by Mother's incarceration, including her ability to secure housing or pay child support. Mother did not maintain supervised visitation with the Children, provide timely proof that she completed parenting classes, provide timely proof of clean drug screens, or establish stable housing. The trial court found that DCS made reasonable efforts to assist Mother in complying with the plan's requirements, and that the permanency plans were reasonable and related to remedying the conditions that necessitated foster care. Thus, the court concluded that Mother did not comply substantially enough to reduce the risk of harm to the Children so that they could be safely returned to Mother's care.

We agree with the trial court's conclusions that Mother knew about her responsibilities, the responsibilities were reasonable and related to the conditions that

---

[6] Prior to her incarceration in May 2018, Mother attended all but one of her opportunities for supervised visitation with the Children; the one visit that she missed was because of a hospital visit, which she provided proof of to DCS.

[7] The record includes the following certificates of completion on behalf of Mother: (1) "Transformed by the Renewing of Your Mind" dated September 4, 2019; (2) "Parent to Parent: Lessons Learned" dated September 13, 2019; (3) "Improving Relationships" dated October 24, 2019; (4) "Celebrate Recovery" dated November 11, 2019; (5) "Microclinic International Program" dated August 15, 2019.

necessitated foster care, and yet Mother disregarded several requirements of utmost importance to reunification with the Children. Accordingly, we affirm the trial court's determination that DCS proved by clear and convincing evidence the ground of failure to substantially comply with the requirements of the permanency plans.

## C. Persistence of Conditions

Under Tennessee Code Annotated section 36-1-113(g)(3), parental rights may be terminated when the child has been removed from the parent's custody during dependency and neglect proceedings for six months and three factors exist:

> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home . . . .[8]

The purpose of this ground is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). As the statute prescribes, "[a] parent's continued inability to provide fundamental care to a child . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (quoting *In re A.R.*, 2008 WL 4613576, at *20). Further, "[w]here . . . efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.*

The Children were initially removed because they were exposed to Mother's daily use of illegal drugs, and because there were environmental and truancy concerns. The Children last visited with Mother in May of 2018, and there is testimony that when they saw Mother during a February 2020 court date, the Children did not recognize her. Between

---

[8] Tennessee Code Annotated section 36-1-113(g)(3) requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550.

the time the Children were removed and the termination hearing, Mother provided no proof of stable income or housing and remained in rehabilitation. DCS tried to help Mother improve her parenting abilities as evidenced by the four permanency plans entered, each before DCS filed its petition to terminate Mother's parental rights.

At trial, the Children's foster father, Clinton W., testified that he and his wife were prepared to adopt the Children if the trial court terminated Mother's parental rights, and that the Children were thriving in their care. Despite DCS's efforts, the trial court found conditions still existed that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of Mother. The Children were removed from Mother's custody because of drug exposure, truancy, and environmental concerns. Even when Mother completes Transitions' program, she will still be on federal and state probation. Finally, Mother still lacks the financial resources and stable housing for the Children to be safely returned to her. Because of these obstacles, it makes it unlikely that the Children could be returned to Mother's custody in the near future.

The trial court found that the evidence established each of the three statutory factors: persistence of conditions that, in all reasonable probability, would cause the Children to be subjected to further abuse or neglect, preventing their safe return to Mother's care; that there was little likelihood the conditions preventing the Children's safe return would be remedied at an early date; and that continuation of the parent-child relationship between Mother and the Children greatly diminished the Children's chances of early integration into a safe, stable, and permanent home. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i-iii); *see also In re Dakota C.R.*, 404 S.W.3d at 499 ("Where . . . efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." (quoting *In re A.R.*, 2008 WL 4613576, at *20)).

The evidence in the record does not preponderate against any of these findings of fact, or the trial court's determination that DCS proved the ground of persistence of conditions under Tennessee Code Annotated section 36-1-113(g)(3), by clear and convincing evidence. Accordingly, we affirm the trial court's ruling on this ground.

D. Abandonment—Suitable Home

In its final written order, the trial court found the ground of abandonment by failing to provide a suitable home pursuant to Tennessee Code Annotated section 36-6-102(1)(A)(ii) had been proven. We have determined this was error.

At the final hearing on July 31, 2020, DCS voluntarily withdrew the ground of "abandonment by failure to establish a suitable home." The voluntary dismissal of this

ground was acknowledged by the trial court during its oral ruling from the bench. Nevertheless, in its final written order, the trial court found the ground had been proven.

Because the ground was voluntarily dismissed by DCS, we reverse the trial court's finding that the ground of abandonment by failing to provide a suitable home was proven.

### E. Abandonment—Wanton Disregard

Parental rights may be terminated for abandonment, as defined in Tennessee Code Annotated section 36-1-102(1)(A). As is relevant to this appeal, Tennessee Code Annotated section 36-1-102(1)(A)(iv) defines abandonment as follows:

> (iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or *a parent . . . has been incarcerated during . . . part of the four (4) consecutive months immediately preceding the filing of the action* and []:
>
> .     .     .
>
> (c) *Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. . .*

(Emphasis added).

"Wanton disregard" is not a defined term, but this court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.,* 182 S.W.3d 867-68 (Tenn. Ct. App. 2005) (citations omitted).

Tennessee Code Annotated section 36-1-102(1)(A)(iv) represents the General Assembly's "commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and that "[i]ncarceration severely compromises a parent's ability to perform his or her parental duties." *Id*. at 866. "The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R*., No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). Incarceration alone does not satisfy the test for abandonment by wanton disregard. *In re Audrey S*., 182 S.W.3d at 866. Instead, the court must find "by clear and convincing evidence that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." *Id*. A "parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to

determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

Here, DCS filed the petition to terminate parental rights on October 18, 2019, and Mother was incarcerated until at least late July 2019 before entering Transitions. Thus, Mother was incarcerated "during . . . part of the four (4) months immediately preceding the filing of the action."

Since May of 2014, DCS has initiated nine investigations into the Children's home life. Ms. Kirby began working with Mother and the Children in 2016. Since then, two other children were removed from Mother's custody. Those children reached the age of majority while in DCS custody. Additionally, Mother testified to a lengthy history of substance abuse. She admitted that, when the Children were removed, she was using methamphetamine daily. After Riley B. tested positive for methamphetamine, Mother acknowledged exposing the Children to drugs and that her drug use demonstrated a disregard for the Children's safety.

When the Children were removed from Mother's custody, she was on federal probation after pleading guilty to theft of government property over $10,000. Following the Children's removal, Mother pled guilty to aggravated perjury, false report, and aggravated child abuse. Mother is now on both state and federal probation. As explained above, a parent's previous criminal conduct alongside a history of drug abuse may constitute a wanton disregard for the Children's welfare. *See In re C.A.H.*, No. M2009-00769-COA-R3-PT, 2009 WL 5064953, at *5 (Tenn. Ct. App. Dec. 22, 2009).

Based on the foregoing and other evidence in the record, the trial court found that DCS proved the ground of abandonment by wanton disregard for the welfare of the Children under Tennessee Code Annotated section 36-1-102(1)(A)(iv) by clear and convincing evidence. Having determined that the evidence in the record supports the trial court's determination, we affirm the trial court's ruling on this ground.

F. Incarceration for Ten Years when Children are Under Age Eight

Parental rights can also be terminated if "[t]he parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court." Tenn. Code Ann. § 36-1-113(g)(6).

DCS entered the judgment from Mother's conviction for aggravated child abuse into evidence. This judgment established that Mother received a twelve-year sentence for aggravated child abuse. At the time Mother was sentenced, Charles B. was six years old and Riley B. was five years old. Thus, it is not disputed that Mother received a sentence of longer than ten years when the Children were under the age of eight years old. Moreover,

as this court has made clear, we "need not look beyond the judgment for conviction and the sentence imposed by the criminal court in order to determine whether this ground for termination applies." *In re Audrey*, 182 S.W.3d at 876 (citations omitted). Therefore, as the trial court properly found, DCS met its burden to establish this ground.

Accordingly, we affirm the trial court's determination that this ground was proven.

## G. Abandonment—Failure to Manifest an Ability & Willingness to Assume Custody

A ground for termination exists when it is proven by clear and convincing evidence that: (1) the parent failed to manifest either the ability or willingness to personally assume legal and physical custody or financial responsibility of the child, and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. Tenn. Code Ann. § 36-1-113(g)(14); *see In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

The trial court found that this ground had been proven; however, and significantly, the trial court's written order contains no findings of fact upon which to conclude that Mother, as distinguished from Father, failed to manifest an ability and willingness to assume custody of the Children. We acknowledge that the final written order sets forth specific factual findings sufficient to establish this ground as to Father's actions or omissions; yet, the written order contains no factual findings regarding Mother's actions or omissions that are germane to this ground.

DCS requests that we overlook the lack of factual findings because the record is thorough and the trial court's decision is readily ascertainable. *See In re A.C.S.*, No. W2015-00487-COA-R3-PT, 2015 WL 5601866, at *4 (Tenn. Ct. App. Sept. 23, 2015) (holding that even though the trial court's order does not make specific findings of fact to facilitate appellate review, a thorough review of the record reveals that the trial court's decision is readily ascertainable, so this Court can 'soldier on' and resolve the case on the merits). We respectfully decline to do so for two reasons.

First of all, in their 2016 decision in *In re Carrington H.*, our Supreme Court explains that the trial court is required to enter an order with "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." 483 S.W.3d at 523 (citing *In re Angela E.*, 303 S.W.3d at 255). They go on to explain that the appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. Our second reason is more down to earth. We have affirmed five grounds upon which Mother's parental rights may be terminated. Finding a sixth ground will be of no consequence. Accordingly, we hold that this ground was not proven.

Having determined that DCS proved several grounds for termination, we next consider whether termination was in the Children's best interest. *See* Tenn. Code Ann. § 36-1-113(c); *see also In re Valentine*, 79 S.W.3d at 546.

## II.     BEST INTEREST ANALYSIS

Mother argues that the court erred by finding it was in the Children's best interest for Mother's parental rights to be terminated "while she was in the process of successfully completing rehabilitation." Mother contends that she made significant changes because of her involvement in Transitions and is now a different person.

Mother testified that DCS never gave her the time to prove herself or to fully comply with the parenting plan. While acknowledging that she made several mistakes, Mother contends her parental rights should not be terminated while she is working to accomplish the exact thing the Department of Children Services requested of her—getting off drugs.

Tennessee Code Annotated section 36-1-113(i) lists nine factors that are to be considered in the analysis[9]; however, these "factors are illustrative, not exclusive," and the

---

9 When the trial court entered its order terminating Mother's parental rights, Tenn. Code Ann. § 36-1-113(i) included nine factors:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may

- 14 -

parties are free to offer proof of any other relevant factor to the analysis.[10] *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In *In re Gabriella D.*, the Tennessee Supreme Court summarized the law pertaining to this analysis:

> Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

531 S.W.3d 662, 681–82 (Tenn. 2017) (citations omitted).

"The child's best interests must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.,* 182 S.W.3d at 878 (citations omitted). "When the best interests of the child and those of the adults are in conflict, such conflict shall always be

---

render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

[10] Tennessee Code Annotated section 36-1-113(i) has been amended and the best interest factors to be considered have been revised. See Act of April 22, 2021, ch. 190, § 1, 2021 Tenn. Pub. Acts ---- (to be codified as amended at Tenn. Code Ann. § 36-1-113(i)). The amended statute applies to petitions for termination that are filed on or after April 22, 2021; thus, the new factors does not apply to this case.

resolved to favor the rights and the best interests of the child[.]" Tenn. Code Ann. § 36-1-101(d). The trial court set forth findings of fact regarding the factors it deemed applicable, and we review those findings below.

## A.  Adjustment of Circumstance

The first factor in Tennessee Code Annotated section 36-1-113(i)(1) is "[w]hether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian."

The testimony revealed that Mother has not had custody of the Children for more than two years, and she had been incarcerated for a period of time prior to the filing of the petition. Additionally, the trial court found that Mother still lacked proper financial resources or stable housing to care for the Children. Further, and more significantly, we have affirmed the trial court's finding that Mother committed severe child abuse of one of the Children and Mother pled guilty to severe child abuse during the pendency of these proceedings. As a consequence, and as a matter of law, Mother cannot make an adjustment of circumstances that would make it safe and in the best interests of the Children to be in a home with Mother.

Based on these and other facts, the trial court found that Mother had not made an adjustment of circumstances, conduct, or conditions as to make it safe and in the Children's best interest to be in Mother's home. The evidence does not preponderate against this finding.

## B.  Lasting Adjustment

The second factor in Tennessee Code Annotated section 36-1-113(i)(2) is "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible."

As previously discussed, Mother has not yet resolved several of the issues that caused the Children to enter DCS custody. As of trial, Mother was still without a home and had not shown an ability to maintain her sobriety outside of an inpatient rehabilitation facility. Moreover, while Mother should be applauded for her efforts to refrain from further drug use and to establish stability, the majority of her efforts took place after DCS filed its termination petition.

The trial court found that Mother "failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustments does not reasonably appear possible." While we recognize Mother's progress during her time at Transitions, we agree with the trial court that this factor weighs in favor of termination.

## C. Regular Visitation or Contact

The third factor in Tennessee Code Annotated section 36-1-113(i)(3) is "[w]hether the parent . . . has maintained regular visitation or other contact with the child."

Although the no contact order prevented Mother from further developing a meaningful relationship with her very young children for a period, we are mindful that no contact orders are appropriate in cases where a parent's actions render it unsafe for the child to be around the parent, even if it prevents the parent from being able to establish or develop a meaningful relationship. *See, e.g.*, *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *14 (Tenn. Ct. App. Apr. 23, 2020), perm. app. denied (Tenn. Dec. 10, 2020) (concluding no meaningful relationship existed due to Mother's own actions because "Mother necessitated the no contact order by severely abusing the Children, and thus, ma[de] it unsafe for the Children to be in her custody.").

Mother does not dispute her lack of visitation or other contact with the Children. The trial court found that Mother had not visited with the Children for over a year and when the Children last saw Mother, which was in passing, they did not recognize her. Based on this and other evidence, the trial court concluded this factor favored termination of Mother's parental rights. We agree.

## D. Meaningful Relationship

The fourth factor in Tennessee Code Annotated section 36-1-113(i)(4) is "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." "Often, the lack of a meaningful relationship between a parent and child is the most important factor in determining a child's best interest." *In re Cortez P.*, No. E2020-00219-COA-R3-PT, 2020 WL 5874873, at *12 (Tenn. Ct. App. Oct. 2, 2020) (quoting *In re London B.*, No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *12 (Tenn. Ct. App. Apr. 14, 2020)).

The trial court found that Mother did not have any relationship with the Children "let alone, a meaningful relationship." This was evidenced by the testimony that when the Children saw Mother in February 2020, they did not recognize her. We agree with the trial court that the evidence weighs in favor of this finding.

## E. Change of Caretakers and Physical Environment

The fifth factor in Tennessee Code Annotated section 36-1-113(i)(5) is "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition."

The Children have been removed from Mother's custody for more than six months, and the conditions which led to their removal still exist. Further, the evidence shows that the Children are well cared for in their current foster placement, with foster parents who

want to adopt them. Their foster parents have participated in counseling with the Children and have attended therapy sessions with Charles for his Autism diagnosis.

Based on this and other evidence, the trial court concluded that returning the Children to Mother's custody would, in all probability, cause the children to be subject to further abuse or neglect and would greatly diminish the Children's chance of an early integration into a stable and permanent home. The court found that placing custody of the Children in the legal and physical custody of Mother would pose a risk of substantial harm to the physical or psychological welfare of the Children. The evidence does not preponderate against these findings.

### F. Abusive Behavior

The sixth factor in Tennessee Code Annotated section 36-1-113(i)(6) is "[w]hether the parent . . . , or other person residing with the parent . . . , has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household."

The trial court found that when the Children were in Mother's custody, Mother engaged in the consistent and almost daily use of illegal drugs, and even caused Riley to test positive for methamphetamine. Even more significantly, Mother has pled guilty to the crime of child abuse and one of the Children, Riley, was found to be the victim of severe child abuse, which is a ground for termination. *See* Tenn. Code Ann. § 36-1-113(4).

The trial court concluded that Mother engaged in abusive behavior of the Children, and the evidence does not preponderate against the court's findings.

### G. Child Support

The ninth factor in Tennessee Code Annotated section 36-1-113(i)(9) is "[w]hether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101."

Mother's child support payments were suspended due to her incarceration until she entered the working phase of Transitions in February 2020. As of March 2020, nearly two years after the Children were removed from Mother's custody, Mother's wages were garnished for child support payments. At trial, Mother testified that she was earning approximately $800.00 per month.

The court concluded that Mother lacked the proper financial resources and stable housing to resume custody of the Children; however, that is not the issue at hand. The issue is "[w]hether [Mother] . . . has paid child support consistent with the child support guidelines[.]" *See id.* There is no evidence that Mother failed to pay child support consistent with the guidelines. Accordingly, we disagree with the trial court's finding that this factor favors termination of Mother's parental rights.

Having examined each of the factors the trial court found relevant, and, as the statute requires, considering the factors from the Children's perspective, we agree with the trial court's final assessment that the Children's interests are best served by allowing them to remain in an environment where they are thriving and supported. Thus, it is in the best interests of the Children that Mother's parental rights be terminated.

## IN CONCLUSION

Having determined that clear and convincing evidence proves that statutory grounds for termination of Mother's parental rights exist and that termination of Mother's parental rights is in the Children's best interest, we affirm the termination of Mother's parental rights. Costs of appeal are assessed against the appellant, Scarlett B.

_____
FRANK G. CLEMENT JR., P.J., M.S.